**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **LOCAL NO. 499, BOARD OF TRUSTEES OF THE SHOPMEN'S PENSION PLAN,** | CASE NO. 3:19 CV 2174 |
| Plaintiff, | |
| v. | JUDGE JAMES R. KNEPP II |
| **ART IRON, INC., et al.,** | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |

## INTRODUCTION

Plaintiff, the Board of Trustees ("Board") of the Shopmen's Local 499 Pension Plan ("the Plan"), brought suit, seeking to recover an assessment of withdrawal liability under the Employee Retirement Income Security Act of 1974 ("ERISA"). Currently pending before the Court are the parties' briefs regarding the notice provision of 29 U.S.C. § 1399(b) (Docs. 36, 37) and Joint Stipulations of Uncontested Facts (Doc. 35).[1] For the reasons discussed below, the Court finds the notice provided satisfies the statute and therefore DENIES Defendants' Motion to Dismiss or to Compel Proper Notice. (Doc. 36).

## FACTUAL BACKGROUND

The Plan is a multi-employer pension plan under ERISA and the members of the Board are fiduciaries of the Plan. (Doc. 35, at ¶1). Art Iron, Inc. was one contributor to the Plan, under a

---

1. This case was previously assigned to Judge Jack Zouhary. After initial discussions with counsel indicated a legal dispute over the notice requirement in 29 U.S.C. § 1399(b), Judge Zouhary ordered the parties to file a Stipulation of Undisputed Facts and simultaneous briefs. (Doc. 34). This case was subsequently reassigned to this Court. *See* Non-document Entry dated December 2, 2020.

collective bargaining agreement effective September 11, 2015. *Id.* at ¶6. Art Iron did not execute a new collective bargaining agreement, and ceased to be obligated to contribute to the Plan as of December 1, 2017. *Id.* at ¶7-8.

On January 24 and 25, 2018, Art Iron liquidated the majority of its operational assets. *Id.* at ¶9.

On July 30, 2018, a federal tax lien was filed against property located at 860 Curtis Street, Toledo, Ohio. *Id.* at ¶10. This property was Art Iron's principal place of business; it was owned by AI Real Estate, an Ohio LLC. *Id.* at ¶2-3. Defendant Robert Schlatter is the sole shareholder of Art Iron, Inc, and the sole member of AI Real Estate. *Id.* at ¶4. AI Real Estate was dissolved on November 6, 2019. *Id.* at ¶3.

Two events occurred on October 10, 2018. The Plan sent a letter to Art Iron, AI Real Estate, and Schlatter demanding payment of withdrawal liability in its entire amount by November 15, 2018. *Id.* at *¶*12; *see also* Doc. 25-3 (letter). That same day, the Board adopted an amendment to the Plan regarding Employer Withdrawal Liability, which added a section entitled Article III, Employer Withdrawal Liability, and Section 1305(d), Default. *Id.* at *¶*11.

On January 3, 2019, Art Iron requested review of certain issues related to the withdrawal liability and the demand letter. *Id.* at ¶13.

On September 19, 2019, the Plan instituted the instant action on the withdrawal liability. *See* Doc. 1.

## STATUTORY BACKGROUND

<u>Withdrawal Liability Generally</u>

"Withdrawal liability is a product of the MPPAA [Multiemployer Pension Plan Amendments Act], 29 U.S.C. §§ 1381–1453, which amended ERISA to increase the financial

liability of employers who withdraw from underfunded plans." *CPT Holdings, Inc. v. Indus. & Allied Employees Union Pension Plan, Local 73*, 162 F.3d 405, 407 (6th Cir. 1998); *see also Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984) ("[T]he Act requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan."). "An employer's withdrawal liability is its proportionate share of the plan's unfunded vested benefits, that is, the difference between the present value of vested benefits (benefits that are currently being paid to retirees and that will be paid in the future to covered employees who have already completed some specified period of service, 29 U.S.C. § 1053) and the current value of the plan's assets." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 609 (1993).

Prerequisites to Suit

To begin, a provision of the MPPAA, entitled "Resolution of Disputes", requires certain disputes be resolved through arbitration:

> **(a) Arbitration proceedings; matters subject to arbitration, procedures applicable, etc.**
>
> **(1)** Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration. Either party may initiate the arbitration proceeding within a 60-day period after the earlier of--
>
> > **(A)** the date of notification to the employer under section 1399(b)(2)(B) of this title, or
> >
> > **(B)** 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title.

29 U.S.C. § 1401(a). If no such arbitration proceeding is initiated, "the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set

forth by the plan sponsor" and "[t]he plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection." 29 U.S.C. § 1401(b)(1).

The relevant statutes required a plan to, *inter alia*, provide notice to the employer of the assessed withdrawal liability and a demand for payment:

> **(b) Notification, demand for payment, and review upon complete or partial withdrawal by employer**
>
> **(1)** As soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall--
>
>> **(A)** notify the employer of--
>>
>>> **(i)** the amount of the liability, and
>>> **(ii)** the schedule for liability payments, and
>>
>> **(B)** demand payment in accordance with the schedule.

29 U.S.C. § 1399(b)(1).

The statute continues, providing a procedure for the employer to request review after receiving that notice:

> **(2)(A)** No later than 90 days after the employer receives the notice described in paragraph (1), the employer—
>
>> **(i)** may ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments,
>>
>> **(ii)** may identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer, and
>>
>> **(iii)** may furnish any additional relevant information to the plan sponsor.
>
> **(B)** After a reasonable review of any matter raised, the plan sponsor shall notify the employer of—
>
>> **(i)** the plan sponsor's decision,
>>
>> **(ii)** the basis for the decision, and

4

> **(iii)** the reason for any change in the determination of the employer's liability or schedule of liability payments.

29 U.S.C. § 1399(b)(2).

Finally relevant here is 29 U.S.C. § 1399(c)(5), which provides:

**(c) Payment requirements; amount, etc.**

\* \* \*

**(5)** In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. For purposes of this section, the term "default" means--

> **(A)** the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure, and

> **(B)** any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability.

29 U.S.C. § 1399(c)(5). As the Seventh Circuit described, this section provides two types of default – a "missed payment default" (subsection (A)) and an "insecurity default" (subsection (B)). *Cent. States Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.*, 620 F.3d 766, 770-71 (7th Cir. 2010). As set forth below, the "insecurity default" described by subsection (B) is at issue here.

## DISCUSSION

The gist of the present dispute is whether the Plan's October 10, 2018 letter satisfies the "notice" requirement of 29 U.S.C. § 1399(b). For the reasons discussed below, the Court finds the Plan provided proper notice.

On October 10, 2018, the Plan wrote Art Iron "pursuant to Section 4219 of [ERISA] . . . to issue a demand to Art Iron, Inc. of its employer withdrawal liability in the amount of

5

$1,185,785.00." (Doc. 25-3). The Plan demanded the entire amount by November 15, 2018 – citing 29 U.S.C. § 1399(c)(5)(B)[2] – and its belief there was a substantial likelihood Art Iron would be unable to pay the withdrawal liability in light of Art Iron's shutdown, liquidation of assets, and federal tax lien filed on the 860 Curtis Street property. *Id.* In response, Defendant Robert Schlatter sent a letter on behalf of Art Iron "request[ing] Review of the Plan Sponsor's Determinations." *Id.* Schlatter said Art Iron requested review and additional information "to corroborate or dispute [the Plan's] assertions." *Id.* Schlatter's letter listed five items for review, and requested specific documents; it did not challenge the sufficiency of the Plan's notice, the lack of a payment schedule, or the Plan's determination that Art Iron was in default. *See id.* The Plan did not respond.

The present dispute is whether the Plan's letter satisfied the notice provisions of § 1399(b), and thus triggered the timeframes in § 1401(a)(1) for requesting arbitration. Defendants contend it cannot, focusing on the words "schedule for liability payments" in § 1399(b)(1)(A). They assert the Plan's demand for the full amount of withdrawal liability – which cited § 1399(c)(5) – does not constitute the "notice" required by § 1399(b)(1) because it contained no schedule and demanded a single lump sum payment, rather than multiple payments. Therefore, Defendants argue, no timeframe for arbitration has yet been triggered. The Plan, on the other hand, asserts the letter satisfies the plain language of the statute, it was entitled – pursuant to § 1399(c)(5) – to request the full amount, and the time to arbitrate set forth in § 1401(a)(1) has expired.

Other courts have found an initial demand for a single lump sum payment of withdrawal liability is appropriate. *See Cent. States, Se. & Sw. Areas Pension Fund v. Dworkin, Inc.*, 2020

---

2. The letter cited "ERISA Section 4219(c)(5)(B)", which is codified at 29 U.S.C. § 1399(c)(5)(B).

WL 5365968, at *2 (N.D. Ill.) (explaining that a "default[] under 29 U.S.C. § 1399(c)(5) . . . provid[es] the Pension Fund with the legal authority to demand full and immediate payment of the withdrawal liability instead of having to resort to a 20-year installment schedule"); *Cent. States, Se. & Sw. Areas Pension Fund v. George Jones Excavating*, *LLC*, 2017 WL 5454457, at *3 (N.D. Ill.) ("Although withdrawal liability typically is paid in installments, a fund may require immediate payment of the entirety of the amount assessed in the event of a default.") (citing, *inter alia*, 29 U.S.C. § 1399(c)(5)); *Teamsters Pension Tr. Fund v. Laidlaw Indus. Inc.*, 745 F. Supp. 1016, 1025-26 (D. Del. 1990) (rejecting argument that a notice was deficient because "it failed to set forth the schedule of payments and a demand for payments in accordance with such schedule"). And courts have noted a challenge to a payment schedule needs to be raised in arbitration. *See Amalgamated Lithographers of Am. v. Unz & Co. Inc.*, 670 F. Supp. 2d 214, 229 (S.D.N.Y 2009) ("The MPPAA and the cases are clear—if an employer wishes to dispute anything relating to its assessed liability or payment schedule, it must raise the matter in a timely arbitration."); *Dworkin*, 2020 WL 5365968, at *3 ("[D]isputes over the amount and the installment schedule of liability payments — which fall within ERISA Section 4219 — must be arbitrated."); *George Jones Excavating*, 2017 WL 5454457, at *4.

In *George Jones Excavating*, the employer argued a demand to "immediately pay the entire assessed withdrawal liability" and failure to "include a schedule of payments" rendered the notice defective. 2017 WL 5454457, at *3. The court specifically rejected this argument, explaining that the invocation of § 1399(c)(5) "means that the entire amount of an employer's withdrawal payment is due immediately upon default." *Id.* It explained further:

> More importantly, "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under section 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1); *Bowers v. Transportacion Maritima Mexicana*, *S.A.*, 901 F.2d 258,

7

> 262 (2d Cir. 1990) (disputes "concerning the notice or amount of withdrawal liability 'shall be resolved through arbitration'" (quoting 29 U.S.C. § 1401(a)(1))). Because Jones Excavating did not challenge the validity of the notice or the calculation of the assessment in arbitration, instead choosing to sit back and do nothing, it has waived its ability to object on these bases. *See Nat'l Shopmen Pension Fund v. DISA Indus., Inc.*, 653 F.3d 573, 582 (employer's failure to complete arbitration "means that [the fund] prevails"); *Teamsters Pension Tr. Fund of Philadelphia & Vicinity v. Laidlaw Indus., Inc.*, 745 F. Supp. 1016, 1026 (D. Del. 1990) (failure to arbitrate served as waiver of right to contest fact that notice did not include schedule of payments).

2017 WL 5454457, at *4. Similarly, the *Laidlaw Industries* court rejected a similar argument:

> "The Defendants assert that the May 3rd notice sent to Boss by the New York Fund is entirely deficient because, *inter alia*, it failed to set forth the schedule of payments and a demand for payments in accordance with such schedule. . . .
>
> "[T]he Defendants' arguments with regard to the notices' content must . . . be rejected. The May 3rd notice to Boss stated that there was a withdrawal liability in a certain amount which was due and owing within a certain time period. When confronted with such an assessment of withdrawal liability, the employer who chooses to ignore it must be prepared to take the risk of that liability becoming due and owing. Certainly the employer and members of the controlled group could have contested with the New York Fund its determination of withdrawal liability. MPPAA provides as much. Indeed, the Defendants could have challenged the content adequacy of that notice.

745 F. Supp. at 1025-26.

And in *Dworkin*, the employer did what Art Iron should have here – initiated arbitration within the statutory timeframe, to resolve, *inter alia*, the issue of whether it was entitled to a payment schedule:

> In July 2017, the Pension Fund demanded that the Defendants pay withdrawal liability of $6,525,802.79, due in full on August 1, 2017. Compl. ¶ 19. The Pension Fund invoked an ERISA provision, 29 U.S.C. § 1399(c)(5)(B), to demand immediate payment when it is substantially likely that an employer will be unable to pay its withdrawal liability in installments. *Id.*
>
> In October 2017, the Defendants responded and asked for a review of the withdrawal liability, invoking an ERSIA [sic] liability-review provision, 29 U.S.C. § 1399(b)(2)(A). *Id.* ¶ 21. The next month, the Pension Fund rejected the request for review and repeated its demand for full payment of the liability—by then revised upward to $7,722,361.20—pursuant to the immediate-payment

>provision. *Id.* ¶¶ 20, 22. In January 2018, Dworkin and Newburgh initiated arbitration under ERISA, 29 U.S.C. § 1401(a), to determine (1) which entities would be deemed part of the controlled group (and therefore could be responsible for withdrawal liability); and (2) whether the 20-year payment schedule permitted under 29 U.S.C. § 1399(c)(1)(B) should apply to the controlled group. *Id.* at ¶ 23; Req. for Arb. at 5.

2020 WL 5365968, at *2.

These cases are also consistent with the structure of the statute. The Court agrees with Defendants that the statute certainly contemplates installment payments in the typical case. But § 1399(c)(5) falls within subsection (c). Subsection (c) is entitled "Payment requirements, amount, etc.", and contains provisions describing the methodology for calculating those installment payments. *See, e.g.*, 29 U.S.C. § 1399(c)(1)-(3). Section 1399(c)(5) also falls within that same subsection, and contemplates specific circumstances in which "a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability". That is, the same section that contemplates installment payments in most circumstances also contemplates an immediate payment of the entire amount due in others. As in the above-described cases, this Court finds the statute permits an initial acceleration of payments upon a finding of insecurity default. Given this, and the above cases, the Court further finds the Plan's October 10, 2018 letter properly served as notice under § 1399(b)(1) despite the absence of a schedule setting forth installment payments.

The Court further finds Defendants' citation to *Van Sant v. Nu-Way Printing & Envelope Co.*, 2020 WL 3840419 (D. Or.), distinguishable. There, after an employer's withdrawal, a pension fund assessed withdrawal liability and set a quarterly payment schedule in 2011. 2020 WL 3840419, at *2. The employer made those payments as scheduled for over seven years. *Id.* In 2018, the employer sold its assets, ceased operations, and vacated its place of business. *Id.* The pension fund, after amending the pension agreement to add events of default, sent the

9

employer a notice of default and demanded a payment of the full withdrawal liability amount pursuant to 29 U.S.C. § 1399(c)(5). *Id.* at *2-3. The employer responded, requesting a review of the assessment under § 1399(b)(2)(A). *Id.* at *3. The pension fund refused, stating such review was only applicable to notices under § 1399(b)(1) and not to an subsequent accelerated withdrawal demand made under § 1399(c)(5); it further asserted that any request for arbitration was untimely, because that provision – 29 U.S.C. § 1401(a) was triggered by the original § 1399(b)(1) notice – and thus the time for arbitration had long expired. *Id.* The Court found – relying on the broad introductory sentence of § 1401(a) ("Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration.") – the dispute was arbitrable. It further explained, distinguishing between the deadlines in § 1401(a)(1) it found applied to § 1399(b)(1) notices and not to other issues, such as a subsequent request for accelerated payment under § 1399(c)(5):

> The text of § 1401(a) does not provide any indication that the broad description in § 1401(a) of the types of cases that are subject to arbitration was narrowed by the inclusion of certain deadlines for initiating arbitration. The fact that arbitration deadlines are established that refer to notices under § 1399(b) does not mandate that only determinations that involve such notices are subject to mandatory arbitration. To interpret the statute otherwise renders the first sentence of § 1401(a) meaningless and makes only the latter sentences define what types of disputes are subject to arbitration. This is improper statutory construction. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).
>
> This difference also makes practical sense. The majority of "determinations under sections 1381 through 1399" will be determinations relating to general withdrawal liability that have notices sent under § 1399(b). They involve long term payment liability, payable quarterly or in other installments. *See* § 1399(c)(3). The inclusion of a deadline for initiating arbitration of such disputes is important to ensure that arbitration is promptly commenced. Accelerated

10

> withdrawal liability, on the other hand, is permitted under the statute only in the event of default. It allows for immediate demand of all the outstanding liability, plus interest. It creates an immediate, and larger, liability. **An employer, therefore, is much less likely to delay raising a dispute concerning accelerated withdrawal liability and not initiate arbitration within a reasonable time. Thus, establishing a statutory deadline is less important in this type of case.**

*Id.* at *5 (emphasis added).

First, the *Van Sant* court's rationale is – at least in part – belied by the very circumstances of this case. Art Iron, despite being charged with an accelerated withdrawal liability (at the outset) due to default, did not attempt to initiate arbitration in the almost eleven months between receiving the October 10, 2018 letter and the Plan's September 19, 2019 initiation of this suit. Second, and more importantly, as described above, the facts in *Van Sant* are distinguishable. There, the notice sent under § 1399(b)(1) and the default determination and request for full payment under §1399(c)(5) were sent over seven years apart. Here, the Plan's October 10, 2018 was the first communication to Art Iron regarding its withdrawal liability. *Van Sant* does not expressly speak to a case such as this one, where the alleged default resulting in financial insecurity occurs so close in time to the withdrawal itself, and is asserted in the initial notice to the employer regarding withdrawal liability. *See* Doc. 35 (Art Iron ceased to be obligated to contribute to the Plan as of December 1, 2017; Art Iron liquidated the majority of its operational assets on January 24 and 25, 2018).

The Court therefore concludes – under the facts and circumstances of this case – the Plan's October 10, 2018 letter served as the "notice" required by 29 U.S.C. § 1399 (b)(1), even with its citation of § 1399(c)(5). Defendant Art Iron, through Schlatter, requested review pursuant to § 1399(b)(2)(A) on January 3, 2019. (Doc. 37-2). This triggered the arbitration timeline set forth in § 1401(a). Art Iron was required, then, to initiate arbitration "within a 60-

day period after . . . 120 days after the date of [Art Iron's] request under section 1399(b)(2)(A)". 29 U.S.C. § 1401(a)(1)(B). That time expired July 2, 2019. This interpretation is consistent with the purpose of ERISA and the MPPAA – to protect participants. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (ERISA's purpose "is to provide a uniform regulatory regime of employee benefit plans"); *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 223 (3d Cir. 2010) (ERISA is to be "liberally construed in favor of protecting the participants in employee benefit plans") (internal citation and quotation omitted). Indeed, the Third Circuit has explained, in addressing constructive notice issues, that "[d]ue to the remedial purpose of ERISA and the MPPAA, the MPPAA's notice provisions are liberally construed to protect pension plan participants." *Bd. of Tr. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 175 (3d Cir. 2002) (internal citation omitted).[3]

This construction also makes sense relative to the parties' actions in this case. Indeed, 85 days after the Plan's letter, Defendant Robert Schlatter sent a letter on behalf of Art Iron "request[ing] Review of the Plan Sponsor's Determinations." (Doc. 37-2, at 3). Schlatter said Art Iron requested review and additional information "to corroborate or dispute your assertions." *Id.* The letter listed five items for review, and requested documents; it did not challenge the

---

3. As another court explained in a different context:

> This conclusion is consistent with the purpose of the §§ 1382 and 1399(b)(1) demand requirement. The legislative history of MPPAA's demand requirement is scant. *See, e.g.,* H.R.Rep. No. 869, 96th Cong., 2d Sess., pt. 1, at 84, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2918, 2952. A common-sense reading of MPPAA suggests that a principal purpose of the demand requirement is to put the employer on notice of the asserted bases of liability. The Philadelphia Fund's letter certainly accomplished that.

*Flying Tiger Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund,* 704 F. Supp. 1277, 1285 (D. Del. 1989). So too was this purpose accomplished in this case.

sufficiency of the Plan's notice, the lack of a payment schedule, or the Plan's determination that Art Iron was in default. *See id.*

Defendants contend this construction of the statute "makes it impossible for an Employer to avail itself of arbitration under the 'pay now, dispute later' provisions of the MPPAA." (Doc. 36-1, at 12). Although such a construction, particularly in circumstances in which an employer is in financial distress or the payment amount is large (as it was here), could make the "pay now, dispute later" approach difficult, the Court disagrees that it is *impossible*. Furthermore, the purpose of the "pay now, dispute later" approach is to shift the risk of loss away from the Plan:

> We have referred to these payments as "interim payments," and referred to this process as "pay now, dispute later." *Mason & Dixon Tank Lines, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund,* 852 F.2d 156, 165 (6th Cir.1988). The congressional intent behind "pay now, dispute later" is to alleviate the risk that during the course of arbitration, an employer will become insolvent, and the fund will not be able to collect in the event of a favorable award. *Trs. of the Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Cent. Transp., Inc.,* 935 F.2d 114, 118–19 (7th Cir.1991). As the Seventh Circuit explained:
>
> > Many [employers] are small and thinly capitalized. During the time consumed by the arbitration and any proceedings to review or enforce the award, some will go out of business.... Although the [fund] bears substantial risk if the employer holds the stakes pending final resolution, the employer faces no corresponding risk if the fund holds the stakes. Pension funds are solvent, diversified, regulated institutions.... [F]unds will be able to repay any withdrawal liability that a court or arbitrator ultimately determines they should not have collected.
>
> *Id.* (internal citations omitted).

*Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 726 F.3d 738, 742 (6th Cir. 2013).

Defendants' remaining contention is that the Plan improperly retroactively applied default rules. *See* Doc. 36-1, at 11 ("[E]ven if an accelerated withdrawal liability demand could constitute notice under 29 U.S.C. § 1399(b)(1) . . . the Plan is constrained by 29 U.S.C. § 1394

13

from accelerating Defendants' withdrawal liability".). Defendants correctly point out that § 1399(c)(5)(B) provides default based on "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." They contend the Plan's October 10, 2018 amendment could therefore not be applied to events that occurred prior to that date. But here too, Defendants are too late. They were similarly required to raise this contention in an earlier arbitration. *See* 29 U.S.C. § 1401(a)(1) ("*Any dispute* between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title *shall be resolved* through arbitration.") (emphasis added). Section § 1394 falls within the cited subsections. If Art Iron wished to challenge the Plan's determination that it was in default – which was contained in its October 2018 notice letter – it was required to do so through a timely arbitration. It did not do so.

Laches

Finally, the Court agrees with the Plan that – even if the October 10, 2018 letter were somehow deficient, and even if Art Iron was not required to raise its contentions in arbitration under the strict timeline set forth in § 1401(a)(1), it is barred by laches from raising them at this juncture. Laches is "a negligent and unintentional failure to protect one's rights." *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991). "A party asserting laches must show: (1) a lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Herman Miller, Inc. v. Palazzetti Imports & Experts, Inc.*, 270 F.3d 298, 300 (6th Cir. 2001). Thus:

> [L]aches does not result from a mere lapse of time but from the fact that, during the lapse of time, changed circumstances inequitably work to the disadvantage or prejudice of another if the claim is now to be enforced. By his negligent delay, the plaintiff may have misled the defendant or others into acting on the assumption that the plaintiff has abandoned his claim, or that he acquiesces in the situation, or changed circumstances may make it more difficult to defend against the claim.

11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2946 at 117 (2d ed. 1995) (internal quotation and citation omitted). And – in a different context – the Supreme Court recognized the defense of laches is applicable within the context of the MPPAA. *See Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Ca., Inc.*, 522 U.S. 192, 205 (1997) ("[I]f an employer believes the trustees have failed to comply with their 'as soon as practicable' responsibility, the employer may assert that violation as a laches objection at an arbitration contesting the withdrawal liability assessment.").

In the instant case, after receiving the Plan's demand for withdrawal liability payment, Art Iron did not challenge: 1) the sufficiency of the notice, 2) the notice's lack of a payment schedule; or 3) the Plan's finding of default. *See* Doc. 37-2, at 3. It did, however, request review of other specific items:

> We request a review of:
> 
> 1. The amount of liability calculated.
> 2. Basis for the determination of the date of withdrawal.
> 3. The basis for the change in valuation interest rate.
> 4. The use of PBGC assumptions and "Segal Blended" liability.
> 5. Basis of and demand for payment of the asserted liability amount.

*Id.* Further, Art Iron did not raise any challenge to the deficiency of the notice or the Plan's determination of default until this suit. Given ERISA's purpose to protect plan participants, and the significant delay in raising these issues, even if the notice was somehow deficient, the Court would find Defendants' challenge thereto at this juncture barred by laches.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendants' Motion to Dismiss Action Under Civ R. 12(b)(6) or in the Alternative to Compel Proper Notice Under 29 U.S.C. § 1399(b) be, and the same hereby is, DENIED.

      s/ *James R. Knepp II*
      UNITED STATES DISTRICT JUDGE